STATE use of the PRESIDENT AND TRUSTEES OF CHAR-LOTTE HALL SCHOOL *vs.* PHILIP GREENWELL.—*December*, 1832.

In an action upon an administration bond, brought for the use of the President and Trustees of Charlotte Hall School, claiming the residue of an intestate's estate, for default of kin within the fifth degree of either consanguinity or affinity, under the acts of 1719, *ch.* 14, and 1729, *ch.* 24, the defendant pleaded in bar, that the intestate left a certain B within the fifth degree of consanguity, who was entitled to the residue, &c.; upon this plea issue was joined. HELD, That B could not be called to prove, that she was related to the deceased, within the fifth degree, as she had a direct interest in establishing that fact.

Where a recovery is had against a trustee in a court of competent jurisdiction, where he has been guilty of no fraud or collusion, but acted *bona fide* in resisting claims against him, he is not answerable over to another, though not a party to the suit, for the same sum adjudged against him.

The administrator being a trustee for the witness, the judgment in this case would be an absolute bar to any suit instituted by the witness to recover her distributive share.

Where the *cestui que trust* has notice that a fund in the hands of his trustee is sued for by a third person, he may participate in the defence of the action, and is barred by a judgment adverse to his interests.

Charlotte Hall School *vs.* Greenwell.—1832.

The declarations of a deceased party are competent evidence, in an action against his administrator for the residue of his estate, to prove that a particular person was his relation, and the degree of the consanguity or affinity between them; but a conversation between the deceased and another, in which each reckoned up their descents, when the deceased remarked, if that be the case, we are second cousins, is not admissible evidence for the purpose aforesaid.

The mode of ascertaining the degree of kindred between two individuals, according to the act of 1798, *ch.* 101, *sub-ch.* 11, *sec.* 15, is to reckon by counting down from the common ancestor to the more remote. This applies to all cases of distribution of personal estate.

Upon a motion in arrest of judgment, no reasons need be assigned. That motion serves in some measure, the office of a demurrer, and brings the whole record to the view of the court.

The act of 1825, *ch.* 117, does not apply either to demurrers or motions in arrest of judgment.

In an action brought in the name of the State, for the use of a person entitled to a fund, it is no valid objection to the judgment, that costs have been adjudged against the State.

That is the proper mode of entering the judgment since the act of 1794, *ch.* 54, *sec.* 10, and its effect is to render the equitable plaintiff liable to an attachment for costs, if he fails to sustain his action.

Upon a successful motion in arrest of judgment, each party pays his own costs.

The State is not liable for costs unless there exists some legislation to make her so, and no execution should be awarded against her.

Under the act of 1729, *ch.* 24, *sec.* 17, administrators in certain cases are directed to pay, and satisfy the balance of the estate of those intestate persons who leave no legal representatives, &c. "to the visitors of the public school of the county where the deceased resided." The replication in assigning a breach under that act, alleged, that the intestate "K, died possessed of a large personal estate in *Saint Marys* county." HELD, That although this allegation was ambiguous, yet it was sufficient upon a motion in arrest of judgment.

The charter of the visitors and trustees of the Charlotte Hall School, (act of 1774, *ch.* 14,) is to be considered in the light of a public law. Its visitors are liable to a penalty if they refuse or delay the acceptance of their appointment, and the charter is referred to specially in several public laws connected with the fiscal operations of the government. In alleging its right to sue, it is not necessary to refer to the various acts of assembly which relate to it.

When a defendant takes a bill of exception and afterwards succeeds in a motion in arrest of judgment, he has no ground of appeal; yet if the plaintiff appeals, and the court reverses the decision upon the motion, if it is perceived that the County Court has erred upon the bill of exceptions, a pro-

*cedendo* will be awarded, and when the County Court enters a final judgment, the defendant will be entitled to his appeal.

CROSS APPEALS from *Saint Marys* County Court.

This was an action of *Debt*, instituted on the 20th January, 1826, in the name of the *State*, for the use of the *President and Trustees of the Charlotte Hall School*, on the bond of *Greenwell*, as administrator of one *Marcus Killion*, dated 9th September, 1818, in the penalty of £5000.

To the plea of general performance the plaintiff replied, That by a certain act of assembly, made and passed at &c. (1719,) entitled, "an act for the application of such intestates' estates, as leave no legal representatives, and for enforcing proceedings against *temerary* administrators," after reciting among other things, whereas it frequently happens, that persons who are possessed of considerable personal estate, die intestate, leaving no known relations or representatives, legally entitled to the residue thereof; in which cases 'tis observed, some creditor, or pretended creditor of such deceased, most commonly obtains the administration of his goods and chattels, and thereby becomes legally possessed thereof; by virtue whereof, he not only satisfies himself, but all other creditors their just claims, but likewise retains in his hands the total residue of such estate, and converts the same to his own use, on pretence of securing himself against such latent debts, as may thereafter appear, whereby such administrator has the sole benefit of such goods and chattels, as he had no other pretence of right to, save for the satisfying himself a debt, and perhaps but a small one, out of the deceased's estate. For the more just and better application of which residues for the future, it was among other things enacted, that every such administrator as aforementioned, shall be obliged to pay and satisfy the balance of such estates to one of the public treasurers of this province, now State, for the time being, in the same manner as such administrator should have been by law obliged to pay the same to any legal residuary legatee, in case any such should have appeared, to be applied to the

use of schools, in the same manner as the additional duty of twenty shillings per poll on *Irish* servants, and negroes, is directed; save, that whereas, that by the act for the better administration of justice in testamentary affairs, &c. sundry particulars of goods and chattels are directed to be paid in specie, according to the appraisement, to the residuary legatees; in this case, such administrator shall be obliged to pay the said balance of such estate, according to the true value thereof, in current money, for the payment whereof he shall be allowed twenty per cent., that is to say, ten per cent. over and above the ten per cent. usually allowed, provided, that in case such administrator be of kin to the deceased, within the fifth degree of either consanguinity or affinity, that then such administrator, and all others, that are nearly related to the deceased, as such administrator, shall have as good a right to such residue, as if he or they were brothers or sisters' children to the deceased, and such balance shall be distributed accordingly, as by the said act still in force and unrepealed, more fully appears.   And the said State also says, that by an act of assembly entitled, "an additional and supplementary act to the several acts for the administration of justice in testamentary affairs," passed at, &c. (1729,) it was among other things enacted, that every administrator obliged by the act, entitled an act for the application of such intestates' estates as leave no legal representatives, &c. to pay the balance of the estate to one of the public treasurers, shall hereafter be obliged to pay and satisfy the balance of such estate to the visitors of the public schools of the county where the deceased resided, in the same manner as such administrator should have been obliged by law, to pay the same to any legal representative, in case any should have appeared; to be applied to the use of such school, save, that by the acts now in force, sundry particulars of the goods and chattels are directed to be paid in specie, according to the appraisement, to the legal representatives; in this case such administrator shall pay the balance of such estate in current money, or in specie,

at the direction of the visitors, for the payment whereof, if in current money, he shall be allowed ten per cent., if in specie five per cent., and no more; provided, that in case such administrator be of kin to the deceased, within the fifth degree of either consanguinity or affinity, then such administrator, and all others that are as nearly related to the deceased as such administrator, shall have as good a right to such residue, as if he, or they, were brothers or sisters' children to the deceased; and such balance shall be distributed accordingly, as by the said act still in force and unrepealed, more fully appears. And the said State in fact says, that the said *Marcus Killion*, deceased, in the condition of the said writing obligatory mentioned, died possessed of a large personal estate in *Saint Marys* county aforesaid, leaving no relations, or representatives, or relation, or representative, entitled by law, or either of the aforesaid acts of assembly, to the balance or residue of the estate of him the said *Marcus Killion*, in the hands of him the said *Philip*, after paying the debts of the deceased, and that the said *Philip* was, by *Saint Marys* county Orphans Court, appointed administrator of the said *Marcus Killion*, on, &c. and by virtue of the administration, on the estate of the said *Marcus Killion* deceased, possessed himself of the goods and chattels, rights and credits of the said deceased, to a large amount, to wit, to the value of $1604 81¼, current money, at, &c. and that after paying and satisfying the debts of said deceased, there remains a balance or residue of $1604 81¼, current money, payable to the *President and Trustees of the Charlotte Hall School*, which said balance the said State says, the said *Philip* has not paid to the said *President and Trustees of the Charlotte Hall School*, as the law will charge, and he ought to have done, but that the said *Philip* has misapplied the same, contrary, &c.

The defendant rejoined, that the intestate left a certain *Bridget Quigley* within the fifth degree of consanguinity, and as such, entitled to the residue of the estate of the intestate, in the hands of the defendant as administrator, &c.

To this rejoinder the plaintiff took issue.

1. At the trial of the cause the defendant, in support of the issue on his part joined, offered to give evidence by *Bridget Quigley*, in the said rejoinder mentioned, that she was within the fifth degree of consanguinity to the said *Mark Killion*, in the condition of the said bond mentioned; to the competency of the said *Bridget Quigley*, to prove the said fact, the plaintiff, by its counsel objected, and the court,(KEY, and PLATER, A. J.,)sustained the objection, and refused to permit the said witness to give such testimony.

The defendant excepted.

2. The defendant then offered to prove by *Bridget Quigley*, the same person mentioned in the pleadings, that she was the second cousin of the said *Mark Killion*. To the competency and admissibility of which witness, to give testimony, the plaintiff by his counsel objected. The court sustained the said objection, and the defendant excepted.

3. The defendant further offered to give testimony, by a legal and competent witness, that he knew *Mark Killion*; that he was present when the said *Mark Killion* and *Bridget Quigley* each reckoned up their descents; *Mark Killion* first tracing his descent, and then the said *Bridget Quigley* reckoned up hers; upon which the said *Killion* remarked, if that be the case, we are second cousins; and further, that at the time of this conversation, he did not recollect that either, *Killion* or *Mrs. Quigley*, stated that they knew each other in *Ireland;* nor does he recollect that they stated, that they did not know each other before they came to this country; and this witness further stated, that at a subsequent conversation, at a different time and place, he heard the said *Killion* say, that *Bridget Quigley* was his second cousin, in answer to a person who recommended said *Killion* to marry said *Bridget Quigley;* the said witness further states, that he never heard the said *Mark Killion* say, that he knew the father, mother, or any of the ancestors of *Bridget Quigley*, to which testimony the plaintiff by his

counsel objected. The court sustained the objection, and the defendant excepted.

The verdict being for the plaintiff, the defendant moved in arrest of judgment, without assigning any special cause. The court sustained the motion, and gave judgment against the State, for the defendant's costs, and awarded an execution for the same, &c.

An appeal was thereupon prayed by both parties.

The cause came on to be argued before BUCHANAN, Ch. J., and EARLE, MARTIN, and ARCHER, J.

*Alexander*, for the appellant, contended.

1. That the defendant was not entitled to a judgment for costs upon his motion in arrest, though the motion was decided in his favor. 1 *Harr. Dig.* 354. Nor, although the judgment was arrested, should the verdict have been set aside. 2 *Evans' Harr.* 324. 2 *Saund.* 243. And the awarding an execution against the State for the costs, was also erroneous. 2. The pleadings were regular, and judgment on the verdict should have been rendered for the plaintiff. In support of the plaintiff's case, as exhibited by the replication, he referred to the act of 1719, *ch.* 14, *sec.* 2. 1729, *ch.* 24, *sec.* 17. 1802, *ch.* 101, *sec.* 11. 1798, *ch.* 101, *subch.* 11, *sec.* 15. 1723, *ch.* 19. 1753, *ch.* 19. 1758, *ch.* 13. 1774, *ch.* 14. And he insisted, that the acts above referred to, are public acts, of which, the court is bound to take notice, and consequently, they need not be stated in the pleadings. *Towson vs. Havre de Grace Bank*, 6 *Harr. and Johns.* 52. 3. *Bridget Quigley* was ·incompetent, as a witness, being interested in the event of the suit. 2 *Stark. Ev.* 770, 785. *West vs. Randall*, 2 *Mason Rep.* 181. 4. Nor were the declarations of the deceased admissible, being nothing more than hearsay, and not of that character which would make them evidence, even as to matters of pedigree. *Thorne vs. Lord*, 2 *Wm. Black.* 1099. 1 *Phil. Ev.* 188. *Berkely Peerage case*, 4 *Camb.* 404. *Jackson vs. Browner,*

18 *Johs. Rep.* 89.    2  *Com. Rep.* 347.    In the admission of
hearsay evidence, in cases of pedigree, the court exercises a
sound discretion.    *Davis vs. Davis, 7 Har. and Johns.*
36, 95, 357, 507.    *Owings vs. Norwood, 2 Harr. and
Johns.* 101.    *Hall vs. Gittings, 2 Harr. Johns.* 393.

No counsel argued for *Greenwell.*

ARCHER, Ch. J., delivered the opinion of the court.

These are cases of cross appeals from *Saint Marys*
County Court ; the plaintiffs appealing from the judgment
of the County Court on the motion in arrest of judgment.
And the defendant objecting to the opinion of the County
Court expressed in three bills of exception taken at the
trial.

We shall consider these cases as consolidated for the pur-
poses of this opinion, and shall express our views, first,
upon the various questions of evidence, and secondly, upon
the questions arising under the motion in arrest of judg-
ment, and as to the judgment itself.

The claim of the plaintiff rests solely on the fact, ac-
cording to the issue, whether the person referred to in the
pleadings, was related to the intestate within the fifth de-
gree of consanguinity.    The defendant could alone succeed
by establishing that *B. Quigley,* the witness, was entitled to
the very fund in controversy, by showing her relationship
to the intestate.    Now if the evidence offered were true,
and to test its admissibility we must concede it to be true,
then a witness is offered by the defendant, who is in pos-
session of the fund, to prove that the witness herself is en-
titled to the whole fund in controversy ; this we conceive
cannot be done.    She has a direct and immediate interest
in establishing the fact she is called upon to prove.    The
defendant is the trustee for whomsoever may be entitled to
the funds in his hands, and there certainly must exist a
privity between the trustee and the *cestui que trusts,* and
where a recovery is had against a trustee in a court of com-
petent jurisdiction, where he has been  guilty of no fraud,

or collusion, but has acted *bona fide*, in resisting claims against him, it is impossible that he could be answerable over to another, though not a party to the suit for the same sum adjudged against him. Or in other words, that the law could twice make him answerable for the same trust fund. If this doctrine be correct, and we are inclined to think it is, although *B. Quigley*, the witness, was not party to this suit, yet if all the funds in the administrator's hands were swept from him, by a judgment in this case, such judgment would be an absolute bar to any suit instituted afterwards by her against the administrator, to recover her distributive share. The effect of her evidence is, then, to enable the administrator to hold the funds for her benefit; for her evidence shows, that she is entitled to it, and to prevent its recovery against him, when if it was recovered it would be lost to her. In this view of the case, she had a direct interest in the event. But if we were incorrect in this, it is clear that the judgment against the administrator would be a bar against any claim made by the witness, where no fraud or collusion existed, and where she had notice of the controversy, that she might participate it its defence. Here she had notice, and therefore was clearly, properly excluded. The court were therefore right in rejecting the evidence offered on the part of the defendant, in the first and second bill of exceptions.

But we are of opinion, that so much of the evidence in the third bill of exceptions, as relates to the declarations of the intestate, that he, and *B. Quigley* were second cousins, was admissible testimony. It is evidence to prove a relationship within the fifth degree; if it be reckoned by counting down from the common ancestor, to the more remote, according to the rule prescribed by the act of 1798, *ch.* 101, *sub-ch.* 11, *sec.* 15, and that mode must be adopted, whatever was the rule anterior to the passage of that act. The reservation in the 15th section refers alone to the surplus, after making the computation of relationship as required by it, and was not intended to preserve a different mode of

computing relationship, where the schools were to have the surplus, from that prescribed, where the estate was to be entitled to it.

. The admissibility of the intestate's declarations depend upon the same principles, as do all declarations in relation to pedigree.    The conversation with *B. Quigley*, anterior to these declarations, may lessen its weight with the jury, but it comes from an unquestionable source. · It is a very fair presumption, that there exists with every man, particular, actual, or traditionary knowledge, in reference to his own relations, and there exists *prima facie*, a competence in him to speak of them. His means of knowledge *may* vary according to the circumstances in which he may have been placed, and it is for the jury to give credit, or not, to the declarations, as they may think under all circumstances they are entitled to.    Assigning to the intestate, and her who claims to be his distributee, a reasonable age of maturity, as we are justified in doing, from the bill of exceptions, there is hardly a probability, that the facts attempted to be proven by the declarations, could be established by living testimony.    Under these impressions, we think the court should have admitted the declarations, last spoken of in the third bill of exceptions by the intestate, as evidence.    The conversation between the intestate and *B. Quigley*, to prove relationship, was clearly inadmissible.

The objections to the record, arise on a motion in arrest of judgment.    That no reasons have been assigned, constitutes no valid objection against our examination of the record.    The motion in arrest of judgment serving in some measure the office of a demurrer, we must consider that the whole record was brought to the view of the court, and that therefore, as regards the act of 1825, the motion in arrest of judgment must be 'governed by the same principles as a demurrer, and that in neither case, is the presentation of the particular grounds of action in the court below, a necessary preliminary to our entertaining the appeal.

Some objections have gone to the form of the judgment itself, others to the pleadings in the cause. It is no valid objection against the judgment, if costs could in such a case have been rightfully granted, that costs have been adjudged against the State. It is certainly true, that the State is not liable for costs, unless there exists some legislation to make her so ; and the act of assembly of 1794, *ch.* 54, *sec.* 10, so far from creating any resposibility, throws it on the *cestui que use;* and renders such person liable by attachment. On a failure, however, of the plaintiff in his action, the act of assembly contemplates the entry of a judgment, and it could not be entered in any other manner than against the State, because in all the records and proceedings the State's name, and not the name of the *cestui que use,* is used as the plaintiff, and it could not be, therefore, entered against the *cestui que use.* But notwithstanding this, the only effect of the judgment is to create a liability in the *cestui que use* for the amount. In the rendition of the judgment, however, no execution should have been awarded against the State. It is also erroneous in adjudging costs against the plaintiff. In a successful motion in arrest, each party pays his own costs. The defendant is not entitled to costs. He should have taken advantage of the error in the pleadings, by demurrer, and not having done so, he has by laying by, contributed to the costs of the proceeding.

But we conceive the court were in error in arresting the judgment. We can perceive no defect, which after verdict could have availed the defendant. The title of the plaintiff is sufficiently set out in the replication. An averment that *Marcus Killion* died in *Saint Marys* county, without leaving any relation within the fifth degree of consanguity or affinity, and that thereby the equitable plaintiff became entitled to the funds in controversy, was all that was necessary to have been done.

As regards the death of *Killion,* in *Saint Marys* county, the averment in the replication is, *"that he died possessed of a large personal estate in Saint Marys county."* There

is certainly an ambiguity attached to this phraseology. It may mean to describe the locality of the property, or it may be understood, as designating alone, the place of the death of the intestate. Different meanings may be attached to it, according to the punctuation which may be given to it, and standing without punctuation, the sense is equivocal. Had this objection been urged on demurrer, it might have been available; it is a rule in pleading, that if the meaning of words are equivocal, they shall be taken most strongly against the pleader. 2 *H. Black.* 530. But it is not available in arrest; for after verdict an ambiguous expression in a declaration, or replication is cured, and must be construed in that sense, which would sustain the verdict, 1 *Ch. Pl.* 216. *Cowp.* 825; and the court will intend, that the residence in *Saint Marys* county, without which the plaintiff could not recover, was proved at the trial. Courts will, and ought to be cautious, how they arrest judgments after verdict. They should intend nothing to overturn them. 3 *Bur.* 1725; nor ought we to be called upon to be astute, to defeat rights, when the law makes it our duty to be solicitous to maintain them.

We have said that the averment, that the equitable plaintiff was entitled to the funds in controversy, was the only averment of right which was necessary. It could not be requisite, to set out the title of the president and trustees to the funds with particularity, by referring to the various acts of assembly which gave the right, in the pleadings; because the laws in relation to that institution, are clearly public laws. The trustees are made subject, by the third section of their charter, (1774, *ch.* 14,) to the same penalties as the visitors of the county schools, and by reference to the act for the encouragment of learning, and erecting schools in the several counties, it is provided, that every visitor duly appointed shall be liable to a penalty, if he refuse or delay his acceptance of the appointment. *Towson vs. Havre de Grace Bank,* 6 *Harr. and Johns.* It is also clearly to be considered in the light of a public law,

to be judicially noticed by the courts, having been referred to specially in a public law entitled, an act for the promotion of literature, and also referred to generally in a public law, passed in 1826, *ch.* 265, entitled, an act to enable the trustees of county, and other schools and academies, to recover and obtain possession of the funds, and other property and effects, belonging to such schools and academies. This institution has annual donations granted to it by various acts of assembly, and it may therefore be considered as connected with the fiscal operations of the government, and so a public law; and being thus required to notice the laws, in relation to this corporation as public laws, we know by the same means that is is located in *Saint Marys* county, the laws themselves referring to its locality.

The entry of the judgment below being erroneous, and the court having erred in arresting the judgment, we might proceed to pronounce a final judgment in this cause, but by doing so, we should inflict injustice upon the defendant. He would, in such an event, lose the benefit of his exceptions, and of the trial of the matters in issue before the jury; for the appeal on the part of *Greenwell,* is improperly here, and must be dismissed; the judgment below having been in his favor, there was nothing to appeal from. When however, the cause goes back to the County Court, should the plaintiff insist upon the judgment being rendered in his favor, then the defendant will be in a condition to prosecute his appeal, and upon producing the record here, will be entitled to a reversal upon the third bill of exceptions. We have presented our opinion upon these bills of exceptions, in order that a future appeal upon them might be thereby prevented, and supposing, that by the expression of our opinions upon them, the motion in arrest would be withdrawn, and that a new trial would be consented to by the parties. The appeal on the part of *Greenwell* is dismissed with costs; and the judgment in the appeal of the State use of the *President and Trustees of Charlotte Hall School is* reversed, and a *procedendo* awarded.

JUDGMENT REVERSED AND PROCEDENDO AWARDED.