ANNA S. THOMAS ET AL. *v.* TELFAIR W. MARRIOTT.

BESSIE MILLER ET AL. *v.* TELFAIR W. MARRIOTT,
[Nos. 30, 31, October Term, 1927.]

*Decided January 10th, 1928.*

The causes were argued before Bond, C. J., Pattison, Urner, Adkins, Offutt, Digges, Parke, and Sloan, JJ.

*Edward Duffy, Frank B. Ober,* and *Carlyle Barton* argued for various appellants, and on the briefs were *C. Alex. Fairbank, Jr., Leigh Bonsal, Louis Mitnick, Walter C. Mylander, Charles M. Armstrong, Charles Lee Merriken, Janney, Ober, Slingluff & Williams,* and *Niles,.Barton, Morrow & Yost,* for various appellants.

*Vernon Cook* argued for the appellees, and on the briefs were *George Ross Veazey* and *Gaylord Lee Clark,* for the trustees, appellees.

Bond, C. J., delivered the opinion of the Court.

A single question of law is presented in these cases: How are degrees of consanquinity to be computed to determine who are "collateral relations in equal degree" to take the estate of a deceased owner under section 135 of article 93 of the Code? The parties were all collaterally related to a decedent whose property is to be distributed under this statutory provision, and are all descended in three degrees from different common ancestors of the decedent, but the decedent on his side was not descended in equal degrees from all these common ancestors; so that, if comparative degrees of collateral relationship are to be ascertained by merely counting down from the common ancestors (the canon or common law method), all the parties stand equally in the third degree to the decedent and will divide the property equally, while if the degrees are to be ascertained by the civil law method, of beginning the count with the decedent, and counting up to the common ancestors and down to the claimants, those on

the side of that common ancestor nearer to the decedent will themselves be nearer in degree to the decedent, and will take all the property. The court below came to the conclusion that the latter method of computation, the civil law method, was the one intended by the statute in Maryland, and ordered the property distributed accordingly. The question has never before been directly presented for decision in this court; it has now been exhaustively investigated and argued in this case by counsel on both sides.

The deceased owner, Henry T. Keyser, late of New York City, died in 1924, leaving a will dated in 1904, by which he had given and bequeathed all the residue of his property to his sister, Mrs. Mary P. Dexter, who had died in 1915 without leaving a husband or descendants surviving her, and leaving as her heirs only those who are the heirs of herself and her brother alike. The property included real estate in Baltimore City, and Telfair W. Marriott, the appellee, brought a bill in the court of equity praying a sale under the jurisdiction of the court and a distribution of the proceeds to those entitled as heirs. As real property now, under the Act of 1916, ch. 325, descends to those relatives who take personal property of an intestate in distribution under article 93 of the Code, those entitled are to be ascertained by reference to that article. The decedent left no children or descendants, parents, brothers or sisters, or children or descendants of brothers or sisters, and the right to take in that situation is covered by the provision in section 135 of the article, that then all "collateral relations in equal degree shall take." All the relatives named in the proceedings are great grandchildren of common ancestors of Henry T. Keyser, but Telfair W. Marriott traces his descent from a paternal grandfather of the decedent, while all the others trace from his maternal great-grandfather, and the court below concluded that Marriott was related to the decedent in the fifth degree of consanguinity within the meaning of the statute, and the remaining parties in the sixth; these latter contend on their appeals that under the proper method of computation they

and Marriott stand equally in the third degree, and should share equally.

Section 135 contains in itself no reference to a method of computation, and if it stood alone would be construed by the ordinary, established, meaning of the words at the time of original enactment, if there was such, or by customary methods of computing the degrees, but section 140, on the passing of property of a deceased owner to the State for the schools in case there are none of the various classes of relatives previously enumerated, provides:

> "If there be no widow or relations of the intestate within the fifth degree, which shall be reckoned by counting down from the common ancestor to the more remote, the whole surplus shall belong to the State, and shall be paid to the board of county school commissioners of the county wherein letters of administration shall be granted upon the estate of the deceased for the use of the public schools of said county."

And the question in the case is; finally, one of the effect, if any, of these words, inserted in section 140, "which shall be reckoned by counting down from the common ancestor to the more remote," upon the method of determining what collaterals are in equal degree under section 135.

The method of reckoning by counting down from a common ancestor was a familiar one, which might conceivably have been adopted for all calculations of degrees, having been used at common law in determining rights of inheritance in land (2 *Blackstone, Comm.* 206); and it is open to question whether, if a selection of method was to be made, this or the other would be deliberately adopted for one section of the statute only, and not for all calculations. Both sections, in their present form at least, were originally enacted at the same time, subchapter 11, sections 11 and 15, of the Acts of 1798, ch. 101, which was a comprehensive collection and codification of all the Maryland law on the subjects of probate and administration. On the other hand, it seems likely that, if the particular method was to be specified for com-

puting degrees of relationship among collaterals under the earlier section, it would have been so stated in that section, or been more clearly made to apply to computations of degrees under any section. Moreover, the particular method is not provided in section 140 for precisely the same purpose; that section is clearly intended to provide for passing the property to the State upon failure of any relations in the various classes successively enumerated in previous sections,—construed otherwise, section 140 would pass the property to the State merely upon failure of a widow and collaterals.

The provision is intended merely to set a limit to the claims of relationship to be recognized before passing the property to the State, and for the purposes of the provision itself should be construed as if worded: If there be no widow or relations of the intestate within the fifth degree (as to collaterals) beyond a common ancestor, the property shall pass to the State for the schools. The apparent origin of the provision indicates this. The draftsman of the Act of 1798 apparently had before him, when he drafted this particular provision, acts passed in 1719 (chapter 14) and 1729 (chapter 24) to save, from volunteering administrators who were pocketing them for themselves without just claim, the residues of estates of persons dying without known relatives or representatives legally entitled. These residues, instead of being held by the administrators, were thenceforth to be passed to the public treasuries of the counties for schools (Act 1719), or directly to the visitors of the schools (Act 1729). In both acts there was a proviso (sections 3 and 18 in the respective acts): "That in case such administrator be of kin to the deceased within the fifth degree of either consanguinity or affinity, that then such administrator shall have as good a right to such residue as if he or they were brothers' or sisters' children to the deceased, and such balance shall be distributed accordingly. Provided nevertheless that in case there be a widow, no collaterals shall be admitted." But the clause in the Act of 1798, for computing

the fifth degree of relationship, is not clearly worded as a mere limitation upon recognition of relationship, and its actual wording affords ground for the argument that the direction inserted was intended to declare the general method of determining comparative degrees.

We think it quite clear that the established method of computation in Maryland up until 1798 had been that of the civil law. That was the method adopted by the Statute of Distribution in England in 1670. Stat. 22 & 23 Charles II, c. 10; 3 *Holdsworth, History of English Law,* 177 and 561; 2 *Blackstone's Comm.* 504. The first Maryland statute on the subject (Acts 1715, ch. 39) was largely copied from the Statute of Distribution, and in sections providing for distribution among next of kindred who are in equal degree, upon failure of wife or children, was in exactly the same words. And Valette, who for ten years prior to his publication of the Deputy Commissary's Guide, in 1774, was register in the office of the Prerogative Court of the Province, which had general jurisdiction over probate and administration of estates of decedents, and who, therefore, must have been familiar with the practice, says (pages 106 and 109) that the civil law degrees were used in distribution of personal property, canon law degrees for title to lands. And accepting this as established, it is arguable with still greater force that if any departure from this long-settled method of computing comparative degrees of relationship and the meaning of the words "in equal degree" had been intended in drafting the Act of 1798, it would have been expressly so stated in the section which is now 135, instead of leaving that section standing as it was, and open to its established implications, with the mere words "collateral relations in equal degree shall take," subject to correction, however, by a clause in a later section on a somewhat different matter. And in addition, there would seem to be a likelihood that such a long established conception of the degrees of relationship would be accepted as fixed and of the nature of things, and left unchanged and unexplained. This seems more likely when it is remembered that the civil law method of ranking the degrees con-

forms to differences in feelings of kinship. These considerations make it seem to us unlikely that the Legislature would mean to abandon the established civil law method of comparisons, at least, without a more specific declaration of its intention in section 135. The same considerations appear to have influenced the widespread continuation of the civil law method, or that of the statute of distribution, in other states of this country. It has been adopted in all but two or three; and in one decision, in the Supreme Court of the District of Columbia (*Matter of Afflick*, 10 D. C. 95), was adopted in determining comparative degrees of kindred under the Maryland Act of 1798. See *Bates v. Brown*, 5 Wall. (U. S.) 18; 1 *Stimson, American Stat. Law*, sec. 3139.

Two previous decisions of this court are to be considered. A headnote to the case of *State, use of President etc. of Charlotte Hall School v. Greenwell*, 4 G. & J. 407, reads: "The mode of ascertaining the degree of kindred between two individuals according to the Act of 1798, ch. 101, subch. 11, sec. 15 (present section 140) is to reckon by counting down from the common ancestor to the more remote. This applies to all cases of distribution of personal estate." There is nothing in the opinion to support the addition of this last sentence. The school was suing on an administrator's bond to recover the amount of surplus in an estate upon lack of relatives of the decedent in the fifth degree, under the provisions in the Acts of 1719 and 1729 already quoted above, which had been kept in force by a saving clause attached in the Act of 1798; that is to say, the Act of 1798, to its provision that when there was no widow and were no relations within the fifth degree which should be reckoned by counting down, etc., as stated, then the surplus should belong to the State for the schools, added a clause, "saving to the different schools in this State the rights which by existing laws they now respectively possess"—and the existing laws were the provisions in the acts of 1719 and 1729. See *Thomas v. Frederick County School*, 7 G. & J. 369. Against the Charlotte Hall School's demand under these old statutes, Greenwell produced evidence to show that there was a living rela-

tive of the decedent, in the fifth degree counting down from the common ancestor as prescribed in the Act of 1798, viz., a second cousin. An unpublished portion of the reporter's notes of the argument, among the papers of the court, shows that counsel for the school replied that the Act of 1798 was not meant to change the method of computing degrees to determine when the schools became entitled under the older acts and the saving clause, the argument apparently assuming that the method of computation under the older acts had been that of the civil law. And on the case thus presented the court said the evidence offered by Greenwell was evidence to prove a relationship within the fifth degree "if it be reckoned by counting down from the common ancestor to the more remote, according to the rule prescribed by the Act of 1798, ch. 101, subch. 11, sec. 15, and that mode must be adopted, whatever was the rule anterior to the passage of that act. The reservation in the 15th section refers alone to the surplus, after making the computation of relationship as required by it, and was not intended to preserve a different mode of computing relationship where the schools were to have the surplus from that prescribed where the State (misprinted *estale*) was to be entitled to it." The reporter's statement in the headnote appears, therefore, to be unrelated to anything in the decision of the court.

In the case of *Dombrovski v. Baltimore,* 141 Md. 422, the court had to deal with a claim by a first cousin of a decedent, under what is now section 141 of article 93, to a surplus previously paid over by the administrator for a school fund, under section 140, which specifies the method of counting. Section 141 provides for repayment to any legal representative who appears after such a payment, and adds, "But no collateral more remote than brothers' and sisters' children shall claim under this section." It was contended that a first cousin was more remote than brothers' and sisters' children, but the court held that they would all be related in the second degree and equally near if the method of counting down from the common ancestor were followed, and that this method, prescribed in the previous section, was to be

applied in the subsequent section, too. The court said, by Judge Offutt, that "there is no reason why the rule fixed by that section (140) for determining when the State would be entitled to take under the distribution should not be followed in determining whether a person entitled under the statute of distribution to take is empowered to recover his share of an estate erroneously distributed to the State under the provisions of section 135" (now 141). The two sections are one in subject-matter, and the second merely a qualification on the provision in the first. And this decision, we think, must be regarded as leaving unaffected the question of the meaning of "collaterals in equal degree" in the earlier section, and the method of ascertaining them, which question was not then before the court. Other cases to which the court has been referred we find it unnecessary to discuss. *McComas v. Amos,* 29 Md. 120; *Hoffman v. Walson,* 109 Md. 537; *Seekamp v. Hammer,* 2 H. & G. 9.

Judge Clement Dorsey, in his text book on *Maryland Testamentary Law,* page 107, published in 1834, the first on the subject after 1798, copied the reporter's note to *State v. Greenwell* for the rule on the method of computation, including the added sentence: "This applies to all cases of distribution of personal estate." It is possible, as has been suggested in argument here, that Judge Dorsey had information that this was the view of the court on the additional question, but that is too conjectural to permit reliance on the statement as authoritative. The next book, *Hinkley on Testamentary Law* (1888), p. 434, disregarded the headnote of the case and reproduced the actual decision of the court, which, as we conclude, did not touch the present point. Major Richard M. Venable said, in his published *"Lectures on Titles,"* part II, page 2, that "the common law method is expressly adopted in the law of distribution of personal property in Maryland," basing this conclusion on the decisions in *State v. Greenwell* and *Thomas v. Frederick County School, supra,* as well as upon the statute itself. Judge Frank, in his book on *Titles to Real and Leasehold Estates,* page 13, construed the statute in the same way. And the

same construction has been adopted by writers of other states reviewing the laws of the country. 1 *Stimson, Amer. Stat. Law,* sec. 3139. But the ground for decision on the point is all laid before the court now after investigation and argument such as Major Venable and Judge Frank did not have before them on this subject collateral to the subject of their studies. We are informed that in one part of the state it has been for many years customary to adopt the common law method of computation of comparative degrees, the method of beginning the count with the common ancestor, but for how many years it has been followed there, and whether this view of the law has obtained anywhere else in the state, we cannot determine.

From this review of the law we think we are not permitted to say that the construction of the statutory provisions has been settled for us by any authority, or by any practice so established in the state that it could be adopted as a practical construction of the law; on the contrary, we believe there is considerable conflict of opinion at the bar on the question we have to decide. And we conclude that the question must be treated as an open one.

Our conclusion on it is that the use of the civil law method was contemplated by section 135 at the time of its adoption, and the section is to be construed and distribution made under it accordingly now. And we are led to this conclusion upon consideration of these facts; that in 1798 this was the long established meaning of the words "in equal degree," and the method was the established method of computing comparative degrees of consanguinity; that the section providing for distribution to collaterals in equal degree was itself left standing as it had been in the law, and open to its long-established implications; that the civil law method which had been previously followed coincided with the ordinary feeling of nearness in kinship, and the general sense of right; that the later section containing the direction for counting down from a common ancestor was concerned only with fixing a limit beyond which collateral relationship was not to be recognized, and it did not clearly determine the method of

computing comparative degrees within the fifth; and that the general nature of the statement of method in that section is not sufficient to justify a conclusion that it was meant to determine the method of computing the comparative degrees for distribution under section 135, in view of the considerations stated above as weighing against that conclusion. This court, therefore, concurs with the lower court.

*Decree affirmed in each case, with costs to be paid out of the proceeds of sale.*