THOMAS, Adm'r of BRADLEE, *vs.* THE VISITORS OF FREDERICK COUNTY SCHOOL.—*December,* 1835.

At an early period the legislature seems to have been deeply impressed with a strong and anxious solicitude to impart to the several counties the benefits of education, by the establishment of schools for the instruction of youth. Their policy was a general diffusion of knowledge, not a design local or partial in its operation, evinced by its extension of the system to the several counties as they were created.

Those laws which were enacted in relation to the institution and patronage of a public school in *Frederick* county, were intended by the legislature, as parts of the general system, and to clothe and invest that school with all the rights and privileges appertaining to the several schools previously established in the other counties of the *State.*

The personal estates of persons dying intestate without any relations within the fifth degree of consanguinity or affinity are distributed to the free schools, or to such schools of the county to which the public aid had been by law extended, in case there should be no college or free school in the county

The dying without relations within the fifth degree, may be established by circumstantial or presumptive proof.

The declarations of the intestate who died in the year 1826, made a short time previous to his death, that he did not believe he had any relations in *Ireland,* the country of his birth, unless it might be an aunt whom he described as far advanced in years when he left Ireland in 1798, and supposed she was dead in the course of nature, and that he had no relations here or elsewhere that he knew of, are sufficient to warrant the presumption of a dying without relations within the fifth degree.

A court when deciding on facts without the intervention of a jury, are authorized to make the same deductions which a jury would make under the same state of the proof.

When an original bill had been filed and answered, and afterwards a petition was filed to amend the prayer of the bill, and the prayer of the bill was amended, and new matter introduced, the defendant without leave filed another answer (in which without replying to the new matter,) he essentially altered and new modeled the matter of his original answer, the court may order the new answer to be taken off the files.

The changing of the name of a corporation by the legislature does not abate an action pending by such corporation, and particularly so when the legislature declares it shall not produce such an effect, which they are competent to do.

The case of *Stevenson vs. Howard,* 3 *Har. and Johns.* 554, considered.

APPEAL from the equity side of *Frederick* county court.

The present bill was filed by the appellees against the appellant, on the 12th of September, 1828, seeking to recover

47        v.7

from her, as the administratrix of one *Newton Bradlee,* certain moneys and stocks, which it was alleged, were held and owned by the deceased at the time of his death. The pleadings and proofs, are fully stated by the learned judge who delivered the opinion of this court.

At February Term, 1834, of *Frederick* county court, (JOHN BUCHANAN, Ch. J. and THOMAS BUCHANAN, A. J.) decided *the question of right* in favor of the complainants, and ordered an account to be taken by the auditor of that court, of the assets of the deceased, preparatory to a final decree. From this order, the defendant appealed to the court of Appeals.

The cause came on to be argued before STEPHEN, ARCHER, DORSEY, CHAMBERS, and SPENCE, Judges.

TANEY, *(Att'y Gen. U. S.)* WM. SCHLEY, and BALCH, for the appellant, contended

1. The appellees are not entitled to the fund in question, even if the other questions should be decided in their favor. Their claim is founded upon the act of 1802, ch. 101, and not upon that of 1729, ch. 24, sec 17, as a free school. Not having asserted their right as a free school, under this latter act, they cannot recover in that character, whether it properly pertains to them or not, notwithstanding the law of 1832, which was only designed to heal defective averments, and not to supply those which are wholly omitted. Claiming in their bill under the act of 1802, they cannot call to their aid, the provisions of the law of 1729, without departing entirely from the position, which they necessarily assumed, when resting their right to recover upon the former law. They must show themselves entitled to relief, in that character in which they have chosen to present themselves, or they cannot recover at all. If however, the aid of the act of 1729, may be invoked, it will not avail them. When that law passed, the act of 1723, ch 19, was of course in existence. By this last law free schools were established, and when by

that of 1729, the surplus of intestates' estates, in certain contingencies, was given to free schools, the legislature certainly meant such free schools, as were then in existence, that is, free schools created by the act of 1723. Suppose there was now a free school in *Frederick*, under the act of 1723, could there be a doubt of its being entitled, in preference to a school or academy created since?

Neither is their right better under the act of 1802. When the act of 1798, ch. 101, sub. ch. 11, sec. 15, was passed, some of the counties were destitute of schools; and consequently, though the rights of the schools are saved where there were schools; where there were none, property in the predicament of that now in controversy, was by this law, vested in the State. The act of 1796, ch. 65, is the original foundation of the complainants, and they have no rights not derived from it, or from subsequent legislation. From previous laws they can derive no aid. In the use of the words, " rights, powers, and privileges," to be found in the act of 1796, the legislature meant to confer corporate powers, and not any right to property, which is shown by the communication of such rights, to the " majority of the visitors," and not to the corporation as a body, to which all right of property would have been transferred.

If there should be any doubt upon the construction of this law, the court will lean against that construction, which would give the property to the complainant, as a recovery under the act of 1802, will be conclusive upon the relations of the deceased, should any hereafter appear. In this respect, differing from the prior laws, under which such relatives are permitted to interpose their claim, notwithstanding a recovery may have been had under them.

2. Another objection to the right of complainants to recover, is presented by the act of 1829, ch. 183. By that act, the old corporation is abolished, and a new one, with a new name, and additional powers created in its place. The old corporation called the *Frederick* school (by whom the suit was brought) was destroyed, with the consent of the

corporators, and a new body brought into being; whose existence, and capacities, are incompatible with the existence and capacities of its predecessor.     The court being bound to take judicial cognizance of the act of 1829, they have notice of the dissolution of the body by whom the suit was brought, and cannot therefore render a decree in its favor.     There can be no decree, either for, or against a body which has no legal existence, but all its rights, and all its obligations devolve on the body appointed to succeed it.     *Angel & Ames on Corporations,* 386.     That new body should have filed a supplemental bill, adopting the proceedings which had before taken place; and without doing so, cannot have the benefit of them.

The act of 1833, gave the new corporation the power to carry on the suit commenced by the old; but could not have intended, that the subsequent proceedings should be prosecuted in the name of a body which ceased to have a legal existence.     It gave the new body, the privilege, of continuing, and completing in its own name that which a previous body had begun; but it would be an anomaly to suppose, that those ulterior proceedings, should be had in the name of a body which died, with the birth of its successor.

As the case now stands, it would be difficult to frame a decree either way to do justice.     The act of 1833, gives the right to the college, but the college is no party to the proceeding, and can have no decree in its favour; and for the same reason there can be no decree against it for costs, if the court should be with the defendant.

3. The new answer of the defendant, should not have been taken off the file.     The bill being amended, the defendant was not only privileged, but bound to put in a new answer.     *Wyatt's Pr. Reg.* 27.     *Mitf. Pl.* 322, *and note.* 2 *Coxe,* 430.     *Ambler,* 70.     *Butterworth vs. Bailey,* 15 *Ves.* 358.     *Earl of Cholmondeley vs. Lord Clinton,* 2 *Ves. and B.* 113.     *Lord Abingdon vs. Butler,* 1 *Ves.* 209.     *Griswold vs. Bigelow,* 6 *Con. Rep.* 259.     *Hines,* 285.     There are cases to show, that the defendant need not answer more than the

new matter of the bill, but none, that he *may* not do so, if he thinks proper. It is the defendant's *duty* to answer the new matter, but his *privilege* to answer the old again, if he chooses to do so, when the bill has been amended.

4. The complainants have not adduced the necessary proof, of the death of the intestate without relatives, within the prescribed degrees. The rule which presumes a party dead, after an unexplained absence of seven years, has reference only to an absence from the party's *own* country; but does not, and cannot apply to the non-appearance of a person, for the same period, in a foreign country. The relations of the intestate in the present case, are foreigners, and consequently no presumption of their death is to be drawn from their not appearing to claim his estate. That he had a relative living, when he left Ireland is abundantly proved, and the *onus* by that proof, was cast on the complainants to show her subsequent death. *Wilson et al vs. Hodges et al*, 2 *East*, 313. 2 *Bac. Abr.* 661. 3 *Stark. Ev.* 1099, *note (E.) Buller's N. P.* 298. *Williams vs. E. Ins. Co.* 3 *East*, 196. Even if they had shown the relative referred to, to be dead, or that is the legal presumption from the circumstances of the case, still the complainants cannot recover, without showing that she died without issue. 3 *Stark. Ev.* 309, *note (E.)*

Ross and Johnson, for the appellee, contended.

1. That the free school system of *Maryland*, originated in the act of 1696, ch. 17, which together with that of 1723, ch. 19, form the basis of the whole subsequent legislation upon the subject, and that all subsequent laws in relation to county schools, are but modifications to meet the exigencies of the times, growing out of the erection of new counties. That *Frederick* county school which was created by the act of 1763, ch. 32, is a part of the system, which is now in force, except so far, as it may be inconsistent with the provisions of later enactments, and that the public aid was extended to it, by that act, as it had previously been to the other county

schools. The *public aid* being so extended to it, the act of 1802, ch. 101, sec. 11, expressly gives to it property in the predicament of the fund now in dispute, and consequently the appellees' title is unassailable, whether they are regarded as a free school or not. If not a free school, they are unquestionably a school to which the public aid has been extended. The act of 1798, ch. 107, gives the school a specific annual donation of $800.

2. The acts of 1719, ch. 14, and 1729, ch. 24, which gave to the county free schools the surplus of the estates of intestates, who die without known relations within the prescribed degrees, did not contemplate an actual *extinction* of heirs, such proof was not required. If none were *known* to be living, the surplus must take the direction pointed out by those acts. They constituted the visitors of the schools trustees for the benefit of the heir of the deceased, if one should thereafter appear; and for that purpose take the residuum from the administrator, and place it in the hands of the visitors, to be by them used *ad interim*, (until an heir appears) for the benefit of the schools. This is the manifest operation of these laws. They do not require, that there shall be no relations. If none are *known* to exist, the fund must go to the complainants. Whether the aunt of the intestate, is dead, or living, is not the issue to be tried. None such can be made under the acts of 1719, and 1729. The question under those laws, is, are there, or are there not, known relations? And the affirmative of that issue, is upon the defendant. And the position assumed by the appellant, throws upon her the burden of proving the aunt's continuing existence. The legal presumption of the continuance of life, will not avail her; an actual living must be proved, to establish the connection between himself, and the aunt, of trustee and *cestui que trust*. *Charlotte Hall school vs. Greenwell*, 4 *Gill and Johns.* 414. The presumption of the continuance of life, can only be used by the party, claiming a title or right to the thing in dispute. *King vs. Paddock*, 18 *Johns. Rep.* 143. *Cranch et ux. vs. Eveleth*, 15 *Mass. Rep.* 305. 2 *Stark. Ev.* 261, and notes.

If however presumptions may be resorted to, the age of the aunt when the intestate left *Ireland*, and the time which has elapsed since, without her having heard from her, creates a stronger probability of her death, than of her existence.

It has been said, that under the act of 1798, the *State*, and not the school is entitled to this fund, if there are no relations to claim it. But the 15th section of the 11th sub. ch. saves the rights of the schools, and as the complainants by the existing laws of the *State* did, and does possess rights, they are within the protection of that section.

3. There is nothing in the objection, that the act of 1829, ch. 183, by changing the name of the corporation abates the suit. It was commenced in the right name, and the objection if valid, should have been taken by plea in abatement. *Angel on Corporations*, 388, 389. Defences arising after the commencement of the action, should be pleaded against its further continuance, and not in bar. *Williams vs. Hodgson*, 2 *Harr. and Johns.* 478.

But if properly pleaded, it would be no defence to the present proceedings. A suit abates at common law by the death of a party, because the death introduces a new party, and changes the condition of the plea. *Gilb. II. C. P.* 195. 1 *Bac. Abr.* 7. *Green vs. Watkins*, 6 *Wheat.* 262.

Such is not the case here; no new party is introduced, the condition of the plea, and the cause of action remain precisely the same as before the act of 1829. The act of 1829, does not create a new corporation. It merely continues the old charter with additional powers. *Angel on corporations*, 514, note 2.

The change of the name does not operate to abate the suit. The rights, privilege and powers of the old corporation remain the same, and all the rights which accrued to it, before the change, may be enforced by it in its original name. 1 *Thomas Coke*, 213, note *A. Colchester Corporation, vs. Seaber*, 3 *Burr. Rep.* 1871, 1873. *A fortiori* a suit begun by the old corporation, before the change, may be prosecuted to final judgment in the same name. But the

act of 1833, ch. 56, which was passed *ex abundanti cau-
tela*, places the question beyond dispute, and the power of
the legislature to pass the law is not denied.

5. The objection that the amended answer, was improper-
ly ordered to be taken from the file cannot be sustained. The
plaintiffs did nothing more than *modify* the prayer of their
bill. There was no specific relief asked by the amendment,
differing from the general prayer of the original bill, nor was
there a solitary new fact introduced into the case, requiring
an amended answer. When the bill has been amended, the
defendant, having answered the original bill, must confine his
second answer to the new matter. *Hinds' Prac.* 22. *Wyatt's
Rep.* 70. And if he does not do so, but travels again over
the matter of the original bill, his answer will be taken from
the files for irregularity. *Bennington Iron Co. vs. Campbell,*
2 *Page* 163. *Partridge vs. Haycraft,* 11 *Ves.* 570. 1 *Mc
Clellan and Young,* 563. *Ovey vs. Leighton. 2 Sim. & Stuar.*
234. *Thomas Lethbridge,* 9 *Ves.* 463.

STEPHEN, Judge, delivered the opinion of the court.

Whether the appellees in this case, are entitled to the fund
in controversy, depends upon the construction of several acts
of assembly of this *State*, designating the manner in which
the property of an intestate shall be disposed of, who dies
without leaving heirs, or legal representatives, within certain
specified degrees of consanguinity or affinity. The case has
been argued with much ability, and the right of recovery
denied *in limine*, by the counsel for the respondents, upon
ground, that the school is not of the character contemplated
by the several acts of assembly, making provision upon the
subject.

At an early period of the history of the then *Province*, but
now *State of Maryland*, the legislative department of the
government, seemed to have been deeply impressed, with a
strong and anxious solicitude, to impart to the several coun-
ties the benefits, and advantages of education, by the estab-
lishment of schools for the instruction of youth. This wise

and enlightened policy had for its object, a general diffusion of knowledge, and was not designed to be local or partial in its operation. That such a feeling strongly pervaded the legislative mind of that day, is fully evinced by the fact, that the benefits of the system were extended to the several counties as they came into being, and particularly by the pointed phraseology of the laws themselves, by which such extensions were from time to time progressively made. The complainants in the case allege, as the ground of their title, that *Newton Bradlee,* late of *Frederick* county, on or about the first of February, 1826, died intestate in said county, without leaving any known relations, or representatives, within the *fifth* degree of consanguinity or affinity; that letters of administration on the personal estate of said *Bradlee,* in due form of law, were by the Orphans' court of said county, on the 13th of February, 1826, granted to *Catharine Thomas* the respondent, and that she in her first account settled with the Orphans' court, after deducting all expenses and allowances, except her allowances for commission, returned as the balance due the estate of said *Bradlee,* $743.58½ in cash, also the following stocks to wit: $1,200 in the six *per cent.* loan to the *United States,* of July 1st, 1813, and $2,250 in the six *per cent.* loan to the *United States,* of July 1st, 1814, with interest on the aforesaid stocks from October the 1st, 1826. The complainants further state in their bill, that by an act of assembly, passed in the year 1763, ch. 32, and by a supplementary act passed in the year 1796, ch. 65, a public school was erected in *Frederick* county; visitors were appointed, and said school was put on an equal footing in all respects, with the public schools erected in the *State of Maryland* by an act of assembly, passed in the year 1723, ch. 19. The complainant further charges, that by an act of assembly passed in the year 1729, ch. 24, sec. 17, every administrator is bound to pay the balance of intestates' estates, to the visitors of the public school of the county where the deceased resided, in the same manner, as the administrator is bound by law to pay the same to any legal representatives, in case there be such,

to be applied to the use of such school.   They further allege,
that by an act of assembly, passed in the year 1802, ch. 101,
sec. 11, the personal property of deceased persons, who die
intestate, without leaving representatives within certain de-
grees of consanguinity, is declared to be the property of the
college, if any in such county ; or if none, the property of
any school, to which the public aid by law has been, or may
be extended.   They then charge in their bill, that the public
aid was extended to *Frederick* county school, by an act of
assembly passed in the year 1798, ch. 107, sec. 3.   The
complainants then charge, that in virtue of their rights, de-
rived from said acts of assembly, they applied to the respon-
dent, to pay to them the balance in cash due the estate of
said *Bradlee,* and to transfer said stocks, but that she has
refused to do so, unless under the sanction of judicial authority.
The complainants then pray, that a decree may pass com-
manding the respondent to pay to them the said balance due
the estate of said *Bradlee,* upon a settlement of her final ac-
count with the Orphans' court of the county aforesaid, and
also, to assign and deliver over to them the certificates of
said stock then in her hands, or on her refusal so to do, that
she be compelled to account for the full value thereof, and
pay such value in current money to them.   The answer of
the respondent admits that *Bradlee* died at her house in
February, 1826, in *Frederick* county intestate, and that she
became his administratrix, as stated in said bill ; and that she
has settled with the Orphans' court, an account as stated ;
but states, that respondent does not know, whether or not,
*Bradlee* died without relations as stated in said bill ; and
therefore she does not admit the fact, and calls upon the com-
plainants to establish the allegations of their bill in that par-
ticular, and make out their case by legal and competent proof.
This is the substance of the answer, so far as the allegations
of the same are considered to be material to the merits of this
controversy.   After testimony had been taken in the cause,
the complainants filed a petition for the purpose of obtaining
leave to amend their bill, in which they state, " that in said

bill your petitioners prayed by way of relief, that the said *Catharine*, as administratrix as aforesaid, should be compelled to transfer certain government stocks, the property of said deceased at the time of his death, amounting to the sum of $3,450 to the complainants in said bill of complaint. Your petitioners further represent unto your honors, that they are now advised, that it is necessary to enable them fully to secure the object for which their said bill of complaint was filed, that the said prayer should be amended. Your petitioners therefore pray for leave to amend their said bill in reference to said prayer, by inserting therein a prayer, that the said *Catharine*, the said defendant in said bill of complaint, shall be compelled to assign and deliver over to said complainants, the certificates of said stock, now in her hands, to enable said complainants to receive from the treasury of the *United States* the full amount of money due thereon, or on her refusal so to do, that she be compelled to account with said complainants for the full value of said stock, now in her hands, as administratrix as aforesaid, and pay such value in current money to said complainants." Upon this petition, leave to amend, as prayed, was granted : upon the amendment being made, the respondent filed another answer, which she calls a further answer to the *original* bill ; and her answer to the *amended* bill of complaint of the complainants. In this answer she alleges, that the deceased declared a short time before his death, that he had an aunt in *Ireland,* and that she never heard him say his said aunt was dead, which fact she alleges was inadvertently omitted to be stated in her former answer ; she therefore denies that said *Bradlee* died intestate, as alleged by complainants, without leaving any relations within the *fifth* degree of consanguinity or affinity, so far as she is informed, and calls upon the plaintiffs to prove their averments and allegations according to law. She further states, that she has settled no final account of said estate ; and that she has never received one dollar of the $3,450 mentioned in complainants' bill, on account, or in redemption of the stock or certificates of stock in the original or amend-

ed bill mentioned. To this further or additional answer, the complainants filed their exceptions, and prayed that the same might be treated as a nullity, and taken off the files of the court, as not warranted by the principles and practice of the same ; contending among other reasons, urged as objections to receiving said answer, that the amendment made by them was only in the prayer of their bill, and did not warrant, or call for any further answer on the part of the respondents. These exceptions were sustained by the court, and the answer ordered to be taken off the files thereof.

The first question which will be considered in the investigation, and decision of this case, relates to the construction and operation of the several acts of assembly, under which it is alleged the complainants are entitled to the fund in controversy. In performing this duty, we have endeavoured to arrive at a correct result, by carefully and deliberately examining their several provisions and enactments, but more especially such as relate to the institution in question. And upon the best and fullest consideration which we have been able to bestow upon the subject, aided by all the lights of the able arguments of the counsel on both sides of the question, we have come to the conclusion, that the claim of the complainants upon a fair and just interpretation of those laws, ought to receive the support and sanction of this tribunal. We think that a connected view and comparison of the several acts of assembly passed upon the subject of education, and the establishment of county schools as the means of promoting it will clearly demonstrate, that those which were adopted in relation to the institution and patronage of a public school in *Frederick* county, were intended by the legislature, as parts of the general system, and designed to clothe and invest that school with all the rights and privileges appertaining to the several schools previously established in the other counties of the *State*. By the act of 1719, ch. 14, the fund in controversy was first appropriated to the purposes of education, and was directed to be paid into the public treasury, for the use of schools; and by an act passed shortly after-

wards, that is to say, in the year 1723, ch. 19, provision was made for the establishment of schools in the several counties of the province, and visitors appointed to superintend and manage them, under the denomination of county schools. The schools were then twelve in number, one for each of the twelve counties then in the province, and by section nine, the money in the hands of the treasurers, which had been raised for the use of county schools, was directed to be paid to the visitors of the said schools for the purpose of purchasing lands, erecting school-houses, and employing teachers for said schools. By an act passed in 1729, ch. 24, sec. 17, the administrators of persons leaving no representatives within the limited degrees, were directed to pay the balance of the estate in their hands to the visitors of the public schools of their respective counties, where the deceased resided, to be applied to the use of such school. In 1746, an act passed for erecting a county school in *Worcester* county, and appointing visitors for the same. The preamble to this act of assembly strongly illustrates the object of the legislature when acting upon this subject, and proves it to have been equal and impartial extension of the advantages of learning to all the counties, as they successively came into existence. Its language is in the following terms, " Whereas since the making an act of assembly of this province, entitled an act for the encouragement of learning, and erecting schools in the several counties within this province, the county of *Somerset*, in the said act mentioned, hath been divided, and a new county erected thereout, by the name of *Worcester* county ; and whereas it seems highly necessary that the said new county should have and enjoy the same benefit and advantage in a county school, as the other counties within this province ;" the act then proceeds to appoint visitors for *Worcester* county school, and invests them with all the powers and authorities vested by law, in the visitors of the county schools, which had been previously established for the other counties of the province. By this preamble it appears, that since the act of 1723, *Somerset* county had been divided, and

a new county erected within its territorial limits, by the name of *Worcester,* and so anxiously solicitous was the legislature to dispense equally to all the counties as they arose, the advantages of the general system of education which had been established, that they considered it a bounden duty to place this new member of the family, upon an equal footing with her elder sisters; although her parent, the county of *Somerset,* was then provided for, and receiving her full proportion from the common stock, under the act which had been previously passed. We next find, that by an act passed in the year 1763, ch. 32, a county school was established in *Frederick* county, and the preamble to that act explicitly declares it to be reasonable, that she too, should be placed upon grounds equally advantageous with those other counties which had preceded her in their existence, and the first enacting clause appointing visitors for said school, invests them " with the same rights, privileges, powers and authorities," as the visitors of the other county schools within the province. This investment of similar rights, and privileges it is, which we think clearly gives to *Frederick* county school, the fund in controversy in this suit; and that it was intended to clothe the visitors of that institution not only with similar corporate privileges and franchises, but with all the rights of property which belonged to the county schools, which had been established previously thereto.

We have arrived at this conclusion, because we find that similar language is used in the act of 1774, ch. 14, by which the public school of *St. Mary's, Charles* and *Prince George's,* were united into one, and called by the name of *Charlotte Hall school.* The third section of that act, after providing that the school shall be governed by a president and twenty-one trustees, invests them " with the same rights, privileges, powers and authorities, to every intent and purpose, as the visitors of the other county schools within the province." It was in virtue of this investment of similar rights and privileges, that *Charlotte Hall school* claimed and recovered in this court a similar fund, a few years since; for if she did

not derive the right from that provision of the act, there is no other part or provision of it, which can with a semblance of propriety, be considered as giving it to her.

The fifth section of the act of 1796, vests in the visitors appointed by that law, all the rights, powers and privileges, with which the visitors or trustees were invested by the act of 1763; and the act of 1798, ch. 101, sub. ch. 11, sec. 15, expressly saves to the different schools in the state, the rights which they then had under the laws existing at that time; and at the same session, the legislature made to the school in *Frederick* county, a donation of eight hundred dollars, to be annually paid out of the public treasury forever thereafter. The only remaining act of assembly, which it is deemed necessary to advert to, as bearing upon the question of title involved in this case, is the act of 1802, ch. 101; the *eleventh* section of which act, besides a similar saving to the one provided by the act of 1798, gives the fund in controversy to any school to which the public aid, had been by law extended, in case there should be no college or free school in the county. If therefore, the school established in *Frederick* county is not to be considered a free school, under the provision of the act of 1728, ch. 8, sec. 3, and entitled to the fund in that character, (which we incline to think she is) she is clearly entitled, as a school, to which the public aid or patronage had been by law extended. If then, the school be of such a character, as to be entitled to claim the fund in question; the next question which presents itself, is the fund in that predicament which entitles the school to demand it at the hands of the administrator? or in other words, is there sufficient proof in the cause to establish the fact, that *Newton Bradlee* died intestate, without any relations within the fifth degree of consanguinity or affinity? Of such fact, it must be admitted, no direct or positive proof has been adduced; but we think the circumstantial, or presumptive proof existing in the case, is sufficient for that purpose. It is true, there is some contrariety in the testimony upon the question, but we think it sufficiently appears from the declarations of

384 CASES IN THE COURT OF APPEALS

Thomas vs. Visitors of Frederick county school.—1835.

*Bradlee* himself, made a short time previous to his death, that he did not believe he had any relations in *Ireland*, unless it might be an aunt, whom he described as far advanced in years, when he left Ireland in the year 1798. It is true, one of the witnesses, *Cornelius McNulty*, speaks of his having said that he left a maiden sister in *Ireland*, who was well provided for, and that his brother had either been killed or executed; but there is strong reason to believe that the witness either misunderstood the conversation, or that his memory deceived him, and that it was his aunt, and not his sister about whom the conversation was had; for the same witness proves, that *Bradlee* said at that time (which was in the year 1820, or 1821) he had no other relations except his said sister. *Michael Hauser* deposes, that *Bradlee* told him that at the time he left *Ireland*, he had a brother and a rich aunt living, that one of his brothers had been killed, and that the surviving brother was named *Philip*, and the brother who was killed, was named *Alexander*, and that *Bradlee* did not say he had any other relatives in *Ireland*. The same witness proves, that *Bradlee* told him shortly before his death, that he was anxious to go to *Ireland*, to ascertain if his aunt was living, and assigned as a reason for not going that he was unwilling to incur the expense. *Susan Hanshaw* also proves, she heard *Bradlee* say, he had an aunt living in Ireland about two years before his death. *Thomas C. Shipley* proves, that *Bradlee* told him that when he left *Ireland* he had an old aunt, but that he supposed from her advanced age, from the course of nature she was dead, but he was not certain; the same witness proves, that about eighteen months afterwards, when he asked him about his relations, *Bradlee* said he had no relations in this country or elsewhere that he knew of. The *Rev. Mr. Schaffer* also proves, that a few days before the death of *Bradlee*, he desired deponent to draw his will, and to give to deponent's church two hundred dollars; the residue to *Caroline Thomas*, the daughter of respondent; and that upon the deponent asking him why he wished to dispose of his property in that manner, *Bradlee* said his reasons

were, that when he left *Ireland* he left an old aunt there, but from her advanced age, in the course of nature, he supposed her dead, but did not certainly know, and he had no relations here or elsewhere, that he knew of.

This is the substance of the whole of the testimony, which relates to the question, whether *Bradlee* died intestate, without leaving any relations entitled to the property in controversy in this case. It is fully proved, that about the close of his life, and particularly when he was about to make his will, disposing of his property, he spoke only of his aunt, and of no other relation, and that she was described as a person far advanced in years, whom from the course of nature, he supposed to be dead. What then is the conclusion, which the proof in the cause, fairly and legitimately warrants, upon the question, whether she were dead, or living at the time of the intestate's death ; and what inference would a jury be justifiable in drawing, in relation to that question, under the circumstances of this case? For the same deduction which a jury would be warranted to make, this court is authorized to make when deciding the case, without the intervention of that tribunal. It appears by the proof in the cause, that *Bradlee* left *Ireland* in the year 1798, that when he left there, his aunt was old and far advanced in years ; he died in the year 1826, twenty-eight years after he left *Ireland.* These facts we think, fairly warrant the presumption, that she was dead, at the time of his death ; and such appears to have been his own impression. This presumption of death, arising from her age when he left there, and the lapse of time which has since intervened is sanctioned by a decision of this court, founded upon circumstantial evidence, not stronger in its nature than that which exists in this case. The case is to be found in 3 *Har. and Johns.* 554. A testator by his will dated in 1744, devised a tract or parcel of land intail to his son after his mother's death, and died in 1746. The son in 1780, being in possession conveyed to a certain person, who died intestate in 1800, leaving six children, one of whom conveyed all his

interest to the lessor of the plaintiff. This court determined, that the life estate set up to defeat the action, must from the length of time that had elapsed, be considered as having expired, before the ejectment was brought, and that the plaintiff was entitled to recover. The ejectment was brought in the year 1808, and the will was made in the year 1744; sixty-four years had elapsed from the date of the will to the institution of the suit. The tenant for life had been married, and it appeared by the will, was the mother of four children; and assigning to her a reasonable age, under such circumstances, (which the counsel in that case contended was about twenty-five) and at the institution of the suit, if living, her age would have been about eighty-nine years. In that case the court say, " the life estate set up to defeat the action, from the length of time that had elapsed before the suit was brought, must be considered as having expired before the ejectment was brought." In the case now pending before this court, the presumptive evidence of death to be collected from the declarations of *Bradlee*, and the time which had elapsed after his arrival in this country, is, we think of a character equally strong, with that in the case to which we have referred. If his aunt was an old woman far advanced in life when he left *Ireland*, it is not unreasonable to suppose that she must have been of an age, at the time of his death, not inferior or less, than that of the tenant for life, whose death we have seen, this court thought it not unreasonable to presume. Speaking upon this subject, in 3 *Serg. and Raw.* 493, *Tilghman*, *C. J.* says, " when a man has been proved to be living, the first general presumption is, that he continues to live unless the contrary be proved, the proof of death is therefore thrown upon the party who asserts it. But there may be circumstances which destroy the first general presumption of life, and induce a contrary presumption, namely, of death; and in such cases, the burden of proving the life will be thrown upon the party who asserts it. For instance, although a person who has been from *Philadelphia* to *France*, may be presumed to be living, although he be not

heard of for several years, because such things commonly happen; yet when many years have elapsed without hearing from him, and no circumstance is shown by which this may reasonably be accounted for, it is so contrary to general experience that he should be living, that the jury may, and ought to presume his death. For in such cases what is to be done? The jury must find the fact one way or the other; they are not to give a verdict by caprice, but upon principle; therefore when a man's being alive, is inconsistent with the other fact found in the cause, according to general experience it ought to be presumed that he is not alive."

So in 1*st W. Black. Rep.* 404. *Lord Mansfield, C. J.* says, " In establishing a title upon a pedigree, when it may be necessary to lay a branch of the family out of the case, it is sufficient to show that the person has not been heard of for many years, to put the opposite party upon proof that he still exists." We therefore think that the court below were well warranted in presuming that *Bradlee* the intestate, died without leaving any relations within the fifth degree of consanguinity or affinity, and that the complainants upon that ground were entitled to recover.

We think further that the court below committed no error in ordering the second answer of the appellant to be taken off the file. It professed to be an answer as well to the *original*, as to the *amended* bill, the original bill had been before answered, and no leave to amend the answer had been applied for or granted. It is unquestionably true, that whenever a bill is amended by the introduction of a new fact, a defendant has a right to answer such amendment, and is entitled to the benefit of his answer upon the trial of the cause; but it is equally clear, that after an answer has been filed a defendant has no right to alter or amend it, without the leave of the court first obtained for that purpose. In this case the petition was for leave to amend the prayer of the bill only. But it is alleged, that not only was the prayer amended, but that a new fact was charged, namely, that she had the certificates of stock then in her possession. Upon ex-

amining the answer, it does not appear that there is any thing in it directly responsive to this additional charge, and that the respondent if the right to answer such additional allegation, did exist, has not thought proper to avail herself of it; but under the cover of this privilege to answer anew, she has essentially altered and new modeled her original answer, without the leave of the court first had and obtained for that purpose.   Such a proceeding was clearly unwarranted by the principles and practice of the court, and could not be sanctioned or sustained without establishing a precedent fraught with the most injurious consequences.   A case somewhat analogous, may be found in 1 *Dick. Rep.* 234, where the court pursued a course similar to that adopted by the court below.   It was the case of an amended bill, without an order of the court for that purpose.   The complainant after the amendment made, applied for leave to amend, which was granted, but the bill which had been amended without leave, was ordered to be taken off the file.   If a bill amended without leave, ought to be taken off the file, a *fortiori*, ought an answer when so amended.   We do not think that the appellant has sustained any objection, to the order of the court below from which this appeal has been taken; no final decree has been passed, and the nature and character of the relief which may be ultimately granted is still undetermined. The court have only ordered the auditor to state and report an account, and have directed in what manner it is to be done; but the nature of the relief to be granted by the final decree, still remains open and undecided.   The right determined is a right to the assets whatever they may be.   The account is still subject to the control of the court, and may be corrected or altered in any manner they may think proper.

We do not think that the act of assembly passed in the year 1829, ch. 183, changing the name of this institution, from that of a school to a college, has created any obstacle or impediment to the support of this suit.   We consider, that if any difficulty would have arisen from that circumstance, the act of 1833, has fully and entirely relieved the

case from the operation and effect of such difficulty. The language of that law is explicitly mandatory, that the old corporation shall not lose any of its powers, rights, or privileges by the change of its corporate name; that no suit brought by it shall abate; but that the same shall be continued, and brought to a close, in the name in which the same was instituted; and that the proceeds of such suit shall be applied and appropriated to the use of the college. This act of assembly, we consider perfectly competent to heal every defect and infirmity of title, which might arise from the change of the corporate name; and that every difficulty in supporting the bill of the complainants has been obviated by its enactments, which this court are bound to obey, and cannot feel themselves at liberty to disregard. We therefore think that the order of the court below ought to be affirmed, and the cause sent back for further proceedings preparatory to a final decree.

ORDER AFFIRMED *with costs, and record remanded for further proceedings.*

*Archer* and *Spence, Judges,* dissented.